Littleton, Judge (Bet.),
delivered the opinion of the court:
The plaintiff sues to recover just compensation for the alleged taking by the United States of the plaintiff’s oil *594 pipeline which was attached to a bridge of the Union Pacific Railroad Company over the Rio Hondo, a stream in Los Angeles County, California.
The pipeline had been attached to the railroad’s bridge pursuant to an agreement dated August 1, 1949, between the railroad and the plaintiff. That agreement designated plaintiff as a licensee, provided for an annual rental “during the first 5-year term hereof” and provided for an adjustment of the rental “during each succeeding five-year term.” The agreement further provided that “the license and permission hereby granted * * * may be revoked by [the railroad] at any time by giving the Licensee sixty (60) days’ notice in writing of such revocation.” Pursuant to the agreement, plaintiff installed a 14-inch oil pipeline along the railroad’s right-of-way for a distance of about 2y2 miles, getting its pipeline across the stream by attaching it to the railroad’s bridge.
For some years before plaintiff attached its pipeline to the bridge, the United States had been contemplating the construction of a flood control project in the area of the Los Angeles River, of which the Rio Hondo is a tributary. On April 19, 1950 the United States informed the railroad that the flood control construction work would require the removal of the railroad’s bridge over the Rio Hondo, and the replacing of it by a new bridge of different construction including, among other things, wider spans, at the same location. During the construction of the new bridge, after the removal of the old one, the railroad was to use a temporary by-pass bridge called a “shoofly” for a period of about six months.
The railroad and the United States negotiated a contract for the replacement of the old bridge by a new bridge. The contract, executed on September 19, 1950, provided that the United States would, using the railroad as its contractor for most of the work, build the shoofly, move the tracks to the shoofly, build the new bridge, move the tracks to the new bridge, and remove the shoofly. The contract provided that the railroad would
5. * * * Cause the removal of the existing 14-inch oil line which is owned by the Richfield Oil Company and is attached to the main-line timber trestle, pursuant to *595 license issued by the contractor (railroad), in such manner as to not interfere with the construction of the project. No payment shall be made by the Government for the removal of such oil line.
During the negotiation of the contract between the United States and the railroad, the railroad notified plaintiff that the pipeline would have to be removed from the bridge. Plaintiff requested the United States to agree to pay it the cost of removing the pipeline from the old bridge and replacing it upon the new bridge. This request was refused. Plaintiff removed its pipeline from the old bridge, attached its line temporarily to the shoofly, and, when the new bridge was completed, the plaintiff, pursuant to an agreement with the railroad entitled “Supplemental Agreement,” attached its pipeline to the new bridge. Plaintiff’s expense in connection with the work of removal and restoration was $16,643.70. This suit is for the recovery of that amount, with interest.
It is not necessary to determine the exact nature of plaintiff’s interest in the railroad’s property. Though its agreement with the railroad designated it as a licensee, it would seem that it was a lessee, with a tenancy terminable upon 60-days’ notice. The notice was given, and was acted upon. The agreement stipulated for notice in writing, and such a notice may have been given, but, if it was not, the plaintiff waived that requirement by making no objection to the form of the notice.
The important question is, what was the value of the plaintiff’s interest, in the circumstances. The railroad, which had the power to terminate plaintiff’s interest, was negotating a contract with the United States for the building of the new railroad bridge. The new bridge, the cost of which was to be borne almost entirely by the United States, was to be of great advantage to the railroad. The contract for the new bridge provided in unmistakable terms that the railroad would cause the plaintiff’s pipeline to be removed, and would receive no compensation from the United States for so doing. The railroad, as hereinbefore stated, had the power to require plaintiff to remove its pipeline, without compensation, and by its contract with the United States, it *596 had agreed to exercise that power, without any compensation to be paid by the United States.
In the circumstances, it was inevitable that the plaintiff’s terminable interest would be terminated. Nothing short of unmitigated generosity, complete disregard of all self-interest, on the part of the Union Pacific Railroad, could have saved the plaintiff’s interest from extinction. There is no evidence that the railroad did not mean what it said, and what it had the right to say, when it notified the plaintiff to remove its pipeline from the bridge.
The plaintiff is not entitled to recover and its petition will be dismissed.
The defendant’s contingent claims against the Los Angeles County Flood Control District, and against the Union Pacific Railroad Company, are dismissed without prejudice.
It is so ordered.
LaRamoRe, Judge; Whitaker, Judge; and Jones, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Currell Vance, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business in Los Angeles, California.
2. Plaintiff seeks to recover from the United States the cost of the relocation of its oil pipeline attached to a bridge across the Rio Hondo owned by Union Pacific Railroad Company (hereinafter referred to as Union Pacific), the relocation having been made necessary by the construction of a new bridge to replace the old bridge.
3. The United States has denied liability and in addition has impleaded Union Pacific and Los Angeles County Flood Control District (hereinafter referred to as Flood Control District) as contingent defendants upon whom it claims the loss should legally fall if plaintiff is entitled to recover.
4. Union Pacific is a corporation organized and existing *597 under the laws of the State of Utah, having its principal place of business at Los Angeles, California. The Flood Control District is a municipal corporation organized and existing under the laws of the State of California, having its principal office in Los Angeles, California.
5. The claims in this suit grew out of an extensive flood-control project for the Los Angeles area which had been under active consideration since 1936. The project as ultimately completed was authorized by Public Law 228, 77th Congress, Act of August 18, 1941, and Public Law No. 516, 81st Congress, Act of May 17,1950.
6. The Union Pacific bridge to which plaintiff’s pipeline was attached was across the Rio Hondo but included within the project for the Los Angeles River. Station 28+00 was the beginning of that project on the Rio Hondo, approximately 1,600 feet from the confluence of the Rio Hondo and the Los Angeles River. The Union Pacific also had a metal truss bridge across the Los Angeles River approximately 1,700 feet from the Rio Plondo bridge.
7. The bridge across the Rio Hondo was a wooden pile trestle with the timber bents skew to the normal flow of the channel with the spans only 15 feet apart. The old bridge was at an angle of 54° 32' to the centerline of the proposed channel improvement.
8. From 1940 it was recognized that the Rio Hondo bridge would have to be either modified or removed. On December 22, 1943, Union Pacific wrote the following letter to the Corps of Engineers:
Regarding proposed improvement of Los Angeles River from Stewart and Gray Road southerly approximately 12,000 feet by U.S. Army, subject our conversation during May 1942 and today:
The figures furnished you May 14, 1942, included raising Bridge 8.52 five feet, $16,000, raising Rio Hondo pile trestle three feet, $10,000, embankment and other work for run-offs, including fill between the two structures, $30,000, total $100,000, to which was added $10,000 for contingencies making a grand total of $110,000 based upon raising track and structures under traffic which we decided would be more economical than building a shoofly.
*598 9. In August 1944 the Corps of Engineers prepared a Definite Project Report for the Los Angeles River Channel Improvement. This report was a matter of public record. It was subsequently modified by the 1950 report but there was no change in the proposed treatment of the Union Pacific bridge across the Rio Hondo.
10. The 1944 report also contained a detailed plan for a new Union Pacific bridge across the Rio Hondo. Before the plan was drawn up the Corps of Engineers consulted with Union Pacific to see what type of bridge they desired.
11. Plaintiff secured on August 1, 1949, a license, subject to cancellation with 60 days’ notice, to attach a 14" pipeline to the Union Pacific bridge across the Rio Hondo. Pertinent portions of the pipeline crossing agreement are as follows:
During the first five-year term hereof, the rental above referred to shall be at the rate of $1260.00 per annum. Rental during each succeeding five-year term may be increased if the Salt Lake Company[1] shall find that the value of the strip of land extending five feet each way from said pipeline throughout its length shall have increased over the value of such strip as it was at the date of the commencement of this license. Any such increase in rental shall be in proportion to any such increased value of the land.
Par. II.
6. That the Salt Lake Company shall have the right at any time after having given the Licensee thirty (30) days’ notice in writing, which notice may be, at the option of the Salt Lake Company, served upon the Licensee personally or by the United States mail, to require the Licensee to lower said pipeline or to change the location thereof; and the Licensee agrees, upon demand of the Salt Lake Company, after the expiration of said thirty-day period, to make the changes directed by the Salt Lake Company, free of all cost and expense to it and under its supervision if, after receipt of the notice in the next section provided for, it desires to supervise the same.
*599 8. That the license and permission hereby granted shall be effective as of the date hereof and may be revoked by the Salt Lake Company at any time by giving to the Licensee sixty (60) days’ notice in writing of such revocation, which said notice may be served upon the Licensee personally or by United States mail at the option of the Salt Lake Company; and the Licensee agrees within said period of sixty (60) days after receipt of such notice of revocation, to remove said pipeline and restore the premises of the Salt Lake Company to the condition in which they were prior to the laying and construction of said pipeline; and in the event of failure of the Licensee so to do, the ownership of said pipeline and all fixtures upon the property or right of way and premises of the Salt Lake Company shall thereupon vest in the Salt Lake Company.
9. That the Licensee will not assign this license nor any right herein conferred, without the written consent of the Salt Lake Company thereto, first had and obtained.
10. That the Licensee shall indemnify the Salt Lake Company against and hold it harmless from any and all liability, loss, damage, claims, demands, costs and expenses of whatsoever nature, including court costs and attorney’s fees, which may result from injury to or death of persons whomsoever or damage to or loss or destruction of property whatsoever (including damage to the roadbed, tracks, equipment or other property of the Salt Lake Company or property in its care or custody), when such injury, death, loss, destruction or damage grows out of or arises from any leaks in the said pipelines or the bursting of the same or the explosion or ignition of gasoline and/or oil carried therein or escaping therefrom, or in any other way whatsoever is due to, or arises because of, the existence of said pipelines or the construction, operation, maintenance, repair, renewal, modification, reconstruction, revision, relocation or removal of the said pipelines or any part thereof or to the contents therein or therefrom. The Licensee does hereby release the Salt Lake Company from any and all liability for damages on account of injury to said pipelines from any cause whatsoever.
12. The Corps of Engineers requested of plaintiff by letter dated December 16, 1949, a list of plaintiff’s facilities within the project for the improvement of the Rio Hondo. Plaintiff in its reply dated January 20, 1950, listed certain *600 lines which would be affected and also stated in the letter that the Union Pacific bridge across the Rio Hondo would remain in place. However, the Union Pacific bridge across the Rio Hondo was not within the Rio Hondo project but was rather within the project for the Los Angeles River which included up to station 28+00 of the Rio Hondo from its confluence with the Los Angeles River.
13. On April 19, 1950, the United States informed the railroad company that the flood control construction work would require the removal of the railroad’s bridge over the Rio Hondo and the construction of a new bridge to replace it. The Corps of Engineers requested, by letter dated April 27, 1950, Union Pacific to furnish its comments and suggestions on the specific plans for a new bridge across the Rio Hondo.
14. At a meeting held at the Corps of Engineers office on August 22, 1950, plaintiff was advised by Union Pacific Railroad that the pipeline had to be removed. Plaintiff was also notified previously, either by letter or verbally by Union Pacific, that it had to remove the pipeline, since the bridge was to be rebuilt. On September 1, 1950, plaintiff wrote a letter implying that it had a right to be paid the costs of the proposed removal. Thereafter, at a conference of plaintiff, the Corps of Engineers, and the Flood Control District, held on September 18, 1950, plaintiff declined to claim as a public utility.
15. The Government on September 19, 1950, entered into a contract with Union Pacific Railroad for the relocation, rearrangement or alteration of the Rio Hondo bridge. Pertinent portions of the contract are as follows:
Article 1.
5. Remove and salvage the existing 33-span timber trestle under the main track crossing the Rio Hondo at Railroad Mile Post 8.92 on the San Pedro Branch at Workman, California, including 563 feet of inside guard rail, but exclusive of existing timber piles which are to be removed or cut off by the Government. Cause the removal of the existing 14-incli oil line which is owned by the Richfield Oil Company and is attached to the mainline timber trestle, pursuant to license issued by the contractor, in such manner as to not interfere with *601 the construction of the project. No payment shall be made by the Government for the removal of such oil line.
Article 1.
B. The Government, except as otherwise stated herein, will furnish the necessary services, materials, equipment and labor required to accomplish the following:
1. Furnish and place all compacted fill embankment required for the railroad shoofly, in accordance with the alignment and grade stakes to be set by the Contractor; and in accordance with Government’s bridge-construction contract Drawing, File No. 429/24 and specifications.
2. Construct the proposed shoofly timber trestle in accordance with Government’s bridge-construction contract specifications and Drawing File No. 429/25. This work includes furnishing and installing timber piles, bulkheads, bracing, caps, stringers, ridge ties, guard timbers, appurtenant hardware, and such other work as_ may be necessary, but exclusive of track materials and track fastenings which will be furnished and installed by the contractor.
3. Remove or cut off the timber piles on the existing mainline timber trestle, and construct the proposed new railroad bridge abutments and steel girder superstructure, exclusive of bridge decking, bridge ties, track materials and track fastenings, in accordance with the Government’s bridge-construction contract plans and specifications.
4. Furnish and place all fill material required to raise the existing main-line railroad subgrade to the proposed new grade, between the approximate end limits of the proposed shoofly, in accordance with the Government’s bridge-construction contract Drawing, File No. 429/24 and specifications.
5. After train operation has been restored to the main line and the contractor has removed the temporary shoofly trackage, remove the shoofly earth embankment, including the shoofly timber trestle, and, to the extent possible, restore the original ground occupied by the shoofly outside of the flood-control right-of-way, to a condition equal to its former condition.
All the work, as described in Article 1 herein, shall be performed in accordance with the Government’s bridge- *602 construction contract plans and specifications, and in accordance with, the Contractor’s Drawing dated 6 September 1950.
Article 2.
(b) Pursuant to Public Law 228, 77th Congress, authorizing construction of the project, all easements, rights-of-way, or other interest in real property necessary for the construction of the project are to be provided by responsible local interests, without cost to the Government. The Los Angeles County Flood Control District is acting for such local interests. The Contractor, without cost to the Government, shall make all necessary arrangements with, and convey to or obtain from, the Los Angeles County Flood District any easements, rights-of-way, or other interests in land which may be required for the performance of the work under this contract and for the elimination of the interference of the contractor’s facilities with the construction, completion, and operation of the project.
Article 3. Payment. — (a) The Government shall reimburse the contractor for all costs without profit incurred by the contractor in the performance of this contract.
(b) Such costs shall include all items of expense properly chargeable to the work including, but not limited to labor, materials, transportation, insurance, overhead charges properly allocable to the work, supervision, surveys, permits; rental of tools, equipment and machinery employed m the work, together with such other items of expense as should, in the opinion of the Contracting Officer, be included in the cost of the work. The Government shall reimburse the contractor as provided herein upon receipt of properly certified invoices, in triplicate, supported by such evidence of payment made by the contractor as may be required by the Contracting Officer, all of which must be approved by the Contracting Officer.
(c) The estimated net amount of compensation to be paid to the contractor by the Government as reimbursement for costs incurred by the contractor is Fifty Six Thousand Four Hundred Seventy-Two Dollars No Cents ($56,472.00).
Article 9. Release. — The contractor shall hold and save the Government, its officers, agents and employees, harmless from liability of any nature or kind, for or on account of any claim for damages which may be filed or asserted as a result of the work performed by the contractor hereunder.
*603 Article 15. Negotiated Contract. — This contract is authorized by and negotiated under the following laws: The Act of Congress (Public Law 228, 77 th Congress, 1st Session, H.R. 4911), approved 18 August 1941.
The contract price did not include any sum to reimburse the plantiff for its costs in removing its pipeline to the shoofly, and later to the new bridge.
16. On January 30, 1951, the Flood Control District commenced condemnation proceedings against whatever interests might be outstanding in the land necessary for the flood-control project. Plaintiff was one of the parties named in the summons and complaint. The action was later dismissed as to plaintiff, because the Flood Control District considered that Union Pacific could dispose of plaintiff’s rights under the terms of the license agreement with it.
17. The Flood Control District on May 10, 1951, issued plaintiff a permit to install its pipeline across the Rio Hondo channel within the temporary shoofly crossing of Union Pacific. Pertinent portions of the permit are as follows:
C. Permittee shall assume entire responsibility for all activities under this permit and shall save the District free and harmless from any and all expense, cost or liability in connection with or resulting from the exercise of this permit.
E. Any structures or portions thereof placed on District rights of way or which affect District structures must be removed, revised, or relocated by permittee, without cost to the District should future activities of the District so require, unless otherwise specified on the fact hereof.
18. Plaintiff, by letter dated April 6,1951, requested permission from Union Pacific to attach its pipeline to the temporary shoofly and then to the new bridge when it was completed. A supplemental agreement, granting the requested permit was entered into between plaintiff and Union Pacific as of October 9, 1951. Pertinent portions of the supplemental agreement are as follows:
Section 3. When Licensee’s pipeline has been completed across Salt Lake Company’s temporary shoofly structure in accordance with Section 1 (a) hereof, Licensee shall forthwith remove its pipeline and appurte *604 nances from Salt Lake Company’s present Bridge No. 8.99, and upon suck removal said Original Agreement shall be deemed terminated insofar as said Original Agreement grants to Licensee permission to maintain said pipeline across Salt Lake Company’s present Bridge No. 8.99 as indicated on Exhibit C attached thereto.
When Licensee’s pipeline has been completed across Salt Lake Company’s new Bridge No. 8.99 in accordance with Section 1(b) hereof, Licensee shall forthwith remove its pipeline and appurtenances from Salt Lake Company’s temporary shoofly structure.
Section 5. From and after the date Licensee’s pipeline shall be completed across Salt Lake Company’s new Bridge No. 8.99, the rental payable by the Licensee under said Original Agreement, supplemented as herein provided, shall be reduced from $1,260.00 per annum, as provided in Article 1 of the Original Agreement, to the sum of $1,210.00 per annum. It is expressly agreed that said rental shall continue to be subject to increase at five-year intervals as provided in the second paragraph of Article 1 of the Original Agreement.
Section 6. All work undertaken by the Licensee hereunder shall be at its sole cost and expense, and it is expressly agreed that reference to “bridge structures at M.P. 8.99” in Section 11 of said Original Agreement shall be deemed to include Salt Lake Company’s temporary shoofly structure and new Bridge No. 8.99 hereinabove identified.
19. Thereafter plaintiff removed its pipeline and a new bridge was built by the Corps of Engineers. The complete cost of the new bridge was borne by the Government and its value was approximately three times that of the old bridge.
20. The cost of the removal of the plaintiff’s pipeline to the shoofly and then to the permanent structure was $16,-643.70. No part of this sum has been paid to it by anyone.
CONCLUSION OF LAW
Upon the foregoing findings of fact which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover and its petition is dismissed. The court further decides that defendant’s contingent claims against the Los Angeles County Flood Control District and against the Union Pacific Railroad Company should be dismissed without prejudice.

 The contract referred to the Los Angeles & Salt Lake Railroad Company and its lessee, union Pacific Railroad Company, collectively as “Salt Lake Company.”